[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 I Statement of Appeal
The plaintiffs, Edward B.Wysocki, Alice R. Wysocki, Michael Bongiovanni, Barbara Segura, James D. Donohue, Mary Donohue, Richard C. Joy and Joyce M. Joy, appeal from the decision of the defendant, the Ellington inland wetlands commission (the commission), granting the defendant, William L. Saxon, a permit to conduct regulated activities CT Page 5647 within an area of influence and/or wetlands for the purpose of constructing a driveway. The commission acted pursuant to General Statutes § 22a-42a (d)(1). The plaintiff's appeal pursuant to General Statutes § 22a-43 (a).
 II Facts
On March, 21, 2000, Saxon submitted an application to the commission for a permit to fill 0.1 acres of wetland and 0.9 acres of a wetland buffer area in connection with the replacement of an existing culvert, the construction of a driveway, the improvement of an existing driveway, and the development of a single family residence on 22.53 acres of land located on Jobs Hill Road in Ellington. (Return of Record [ROR], Item #1 (a), p. 2.) Saxon's proposal was to construct a gravel driveway from Jobs Hill Road and connect it to an existing interior woods road to provide access to the home site.[1] (ROR, Item #1(a), p. 2.) A public hearing on the application was held on June 19, 2000, where the commission heard testimony both in support of and in opposition to the application. (ROR, Item #4.) The commission then voted unanimously to close the hearing and to approve the application on two conditions: (1) that Saxon grant the town a fifty foot conservation easement around all wetlands and (2) that the approval was for the driveway and culvert work only, and did not include the house site work.[2] (ROR. Item #4, p. 37.)
Presently before the court is the plaintiffs' appeal of the commission's approval of the application. As grounds for the appeal, the plaintiffs allege that the commission acted illegally, arbitrarily and in abuse of its discretion by failing to follow the town engineer's recommendations regarding the project, failing to consider a reasonable and prudent alternative to Saxon's proposal, failing to follow its own regulations, approving the application without adequate information regarding wetlands on the easterly portion of the property, granting a permit to conduct activities which were different from those requested in the application, and failing to refer the application to the United States army corps of engineers.[3] On May 30, 2001, the plaintiffs filed a memorandum of law in support of their appeal. Saxon filed a memorandum of law in support of the commission's decision on November 1, 2001.
 III Jurisdiction
General Statutes § 22a-43 governs an appeal from the decision of an CT Page 5648 inland wetlands and watercourses commission to the Superior Court. "It is fundamental that appellate jurisdiction in administrative appeals is created only by statute and can be acquired and exercised only in the manner prescribed by statute." Munhall v. Inland Wetlands Commission,221 Conn. 46, 50, 602 A.2d 566 (1992).
 A Aggrievement
"Pleading and proof that the plaintiffs are aggrieved within the meaning of the statute is a prerequisite to the trial court's jurisdiction over the subject matter of the appeal." Munhall v. InlandWetlands Commission, supra, 221 Conn. 50. "Aggrievement is a question of fact for the trial court and the plaintiff has the burden of proving that fact." Water Pollution Control Authority v. Keeney, 234 Conn. 488, 493,662 A.2d 124 (1995). There are two categories of aggrievement, statutory and classical. Cole v. Planning Zoning Commission, 30 Conn. App. 511,514, 620 A.2d 1324 (1993). Section 22a-43 (a) provides in relevant part: "[A]ny person owning or occupying land which abuts any portion of land or is within a radius of ninety feet of the wetland or watercourse involved in any . . . decision or action . . . [may] appeal to the superior court . . .
At a hearing held on February 7, 2002, all of the plaintiffs, except Bongiovanni, introduced deeds demonstrating that they own land which abuts the subject property or is within a radius of ninety feet of the wetlands or watercourses involved. The court finds, therefore, that all of the plaintiffs, except Bongiovanni, are statutorily aggrieved and, as such, entitled to maintain this appeal.
 B Timeliness
Section 22a-43 (a) provides, in pertinent part, that an appeal may be commenced "within the time specified in subsection (b) of section 8-8
from the publication of such regulation, order, decision or action. . . ." General Statutes § 8-8 (b) provides, in part, that an "appeal shall be commenced by service of process . . . within fifteen days from the date that notice of the decision was published. . . ." Section 22a-43
(a) provides that "[n]otice of such appeal shall be served upon the inland wetlands agency and the commissioner [of environmental protection]." Notice of the commission's decision was published in the Journal Inquirer on June 22, 2000. (ROR, Item #3.) The plaintiffs commenced their appeal on July 5, 2000, by service of process upon the CT Page 5649 chairman of the commission, upon Saxon, and upon the commissioner of the department of environmental protection. (Sheriff's Return.) Accordingly, the court finds that the plaintiffs filed a timely appeal upon the proper parties.
 IV Standard of Review
"The purpose of the Inland Wetlands and Watercourses Act (act) is to provide an orderly process in which the rights of landowners to use or develop their land can be balanced with the need to protect the invaluable public resource of wetlands. . . . The statute, and the regulations adopted to implement it, provide for an application and hearing process through which these competing interests are balanced. . . ." (Citations omitted.) Woodburn v. ConservationCommission, 37 Conn. App. 166, 170, 655 A.2d 764, cert. denied, 233 Conn. 906, 657 A.2d 645 (1995).
In an appeal from the decision of an inland wetland commission, the appealing party bears the burden of proving that the commission acted improperly. Newtown v. Keeney, 234 Conn. 312, 319, 661 A.2d 589 (1995);Samperi v. Inland Wetlands Agency, 226 Conn. 579, 587-88, 628 A.2d 1286
(1993). "The plaintiff must do more than simply show that another decision maker, such as the trial court, might have reached a different conclusion. Rather than asking the reviewing court to retry the case de novo . . . the plaintiff must establish that substantial evidence does not exist in the record as a whole to support the agency's decision." (Internal quotation marks omitted.) Newtown v. Keeney, supra,234 Conn. 319. "In reviewing [a] decision made pursuant to the act, the reviewing court must sustain the [commission's] determination if an examination of the record discloses evidence that supports any one of the reasons given. . . . The evidence, however, to support any such reason must be substantial; [t]he credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency. . . . This so-called substantial evidence rule is similar to the sufficiency of the evidence standard applied in judicial review of jury verdicts, and evidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . [I]t imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . and to provide a more restrictive standard of review than standards embodying review of weight of the evidence or clearly erroneous action. . . . The United States Supreme Court, in defining substantial evidence in the directed verdict formulation, has said that it is something less than the weight of the evidence, and the possibility CT Page 5650 of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. . . . The reviewing court must take into account [that there is] contradictory evidence in the record . . . but the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. . . ." (Internal quotation marks omitted.) Newtown v. Keeney, supra, 234 Conn. 319-20.
 V Discussion A. Whether the commission acted improperly by not following the townengineer's report
In a letter to the commission dated June 19, 2000, James A. Thompson, town engineer of the town of Ellington, wrote: "I have inspected the site, reviewed the application, and report as follows: The plans call for the replacement of an existing culvert with an 18" RCP. The existing pipe controls the water level of a pond on the land to the north of the Saxon property. To ensure that the pipe replacement does not affect the pond water level, the inlet and outlet flow lines of the existing pipe must be recorded on the plan, by a land surveyor, and the new pipe must be installed exactly according to these flow lines. An as-built of the pipe should be required, to demonstrate that the pipe is installed properly. The plan calls for the house to be built within the regulated area while there is sufficient space on the land to build the house entirely outside the regulated area. The applicant should demonstrate why relocating the house outside the regulated area is not feasible." (ROR, Item #1(b).)
The plaintiffs argue that the commission acted improperly by not requiring Saxon to record the outlet flow lines of the pipe on the site plan and by not requiring him to provide an as-built plan of the pipe as recommended by the town engineer. (Plaintiffs' Memorandum, p. 3.) Saxon counters that in response to the town engineer's letter, he agreed to relocate the home site outside the wetland and regulated buffer areas. (Defendant's Memorandum, p. 3.) Saxon further responds that the record as a whole reveals substantial evidence to support the commission's decision. (Defendant's Memorandum, pp. 3-5.) Finally, Saxon argues that the plaintiffs' real motive in opposing the application is entirely unrelated to the protection of wetlands and is, instead, an effort to prevent him from building a home in the flight path of the plaintiff, Edward Wysocki's, private airport.[4] (Defendant's Memorandum, pp. 5-7.) CT Page 5651
The commission in the present case did not state on the record its reasons for approving Saxon's application. Consequently, the court must search the record to determine if an adequate basis for the commission's decision exists.
As previously noted, the permit at issue was for a relatively small project — the construction of a gravel driveway, the improvement of an existing roadway, and the replacement of an existing pipe under that roadway in order to provide access to the proposed home site. In addition to the inland wetlands permit application, the record includes a letter from the north central district health department approving the home site as suitable for a subsurface sewage disposal system. (ROR, Item #1(b).) There is also a letter to the commission dated March 21, 2000, from James Sommers, the project consultant, who wrote that "[w]e have made every attempt to minimize the impacts on the extensive wetlands that are present on the property, and still accommodate the access and development plans of our client." (ROR, Item #1(b).) At the June 19, 2000 hearing, Bruce Fader, Saxon's attorney, testified that utilizing the existing road through a portion of the wetlands would avoid disturbing additional wetlands. (ROR, Item #4, p. 20.) He also testified that special materials would be used to construct the portions of the road which pass through wetlands so that the flow of water through the wetlands would not be impeded. (ROR, Item #4, p. 3.)
Edward and James Wysocki spoke in opposition to the application. As previously noted, most of their testimony centered on the impact that the placement of the house would have on their airport.[5] Edward Wysocki, however, also testified that he personally installed the 18 inch corrugated aluminum pipe under the driveway thirty years before and, since that time, had seen the culvert overflow on at least one occasion. (ROR, Item #4, p. 24.) He testified that, in his opinion, the eighteen inch pipe was not large enough and should be increased to 24 inches. (ROR, Item #4, p. 27.) Joseph Baker, the town planner, responded that he and the town engineer, James Thompson, had inspected the site together, measured the existing pipe, and that Thompson had specified that the new pipe should remain eighteen inches. (ROR, Item #4, pp. 24-25.) Baker further testified that in his experience, "if you replace [the drainage pipe] with something that [is] oversized or allows for a better drainage of the upstream wetlands you can end up having an adverse impact on the upstream wetlands." (ROR, Item #4, p. 27.) The commission also stated that Thompson's past performance as the town engineer warranted their confidence in his opinion regarding the size of the replacement pipe. (ROR, Item #4, p. 26.). Finally, in response to Edward Wysocki's pipe concerns, Saxon's attorney stated, "If I may, I think it is getting a little bit out of hand. I think we have to put this in perspective. We're talking about a road for a single family house. . . . [W]e are not CT Page 5652 talking about putting in a large commercial project; we're not speaking about a multi-lot subdivision, all of which would have an impact on drainage. I really don't think, knowing that we're talking about twenty-two acres of land, that there is going to be any significant impact as the result of the construction of either the footprint of this house or the use of this existing driveway." (ROR, Item #4, p. 24.)
The commission's failure to follow the town engineer's recommendations in their entirety is not, itself, improper. Indeed, in Laufer v.Conservation Commission, 24 Conn. App. 708, 713, 592 A.2d 392 (1991), our appellate court stated: "It is quite apparent that the statutory scheme for the resolution of permit applications envisions that the authorized agency shall be the decision maker. While the agency may seek advice and assistance from a professional staff, it is the agency itself that must find the facts and apply the statutory criteria to those facts." Moreover, "[a]n administrative agency is not required to believe any witness, even an expert, nor is it required to use any of the evidence presented to it in a particular manner." Id., 716. Instead, as already noted, the reviewing court must sustain the agency's decision if a search of the record of the hearing before the agency reveals any adequate basis for its decision. Samperi v. Inland Wetlands Agency, supra,226 Conn. 588-89. Accordingly, based on the aforementioned testimony and evidence, the court finds that there is a more than adequate basis in the record to support the commission's approval of Saxon's application, notwithstanding the commission's failure to adhere to all the town engineer's recommendations.
B. Whether the commission failed to consider a feasible and prudentalternative to Saxon's proposal
General Statutes § 22a-42a (d)(1) provides, in pertinent part, that "[i]n granting, denying or limiting any permit for a regulated activity the inland wetlands agency, or its agent, shall consider the factors set forth in section 22a-41. . . ." The factors set forth in section 22a-41 (a) include the existence of any feasible and prudent alternatives to the proposed activity which could cause less or no environmental impact to the wetlands or watercourses. General Statutes § 22a-41 (b) provides in pertinent part that "a permit shall not be issued unless the commissioner finds on the basis of the record that a feasible and prudent alternatives does not exist."[6] The plaintiffs claim that the commission failed to follow its own regulations by not considering feasible and prudent alternatives. Specifically, the plaintiffs claim that the commission failed to follow the town engineer's recommendation that the house be located outside the regulated area. (Plaintiffs' Memorandum, p. 12.) CT Page 5653
When reviewing a record to determine whether feasible and prudent alternatives were considered, our Supreme Court has held that "[a]s long as a search of the record reveals the basis for the agency's decision consistent with the substantial evidence standard . . . then the reviewing court must infer that the local wetlands agency made a finding that the applicant's alternative was the feasible and prudent alternative." Samperi v. Inland Wetlands Agency supra, 226 Conn. 595-96.
A review of the present record reveals that the commission did consider feasible and prudent alternatives to Saxon's proposal. The town planner stated at the hearing: "Now let's see I spoke with the applicant regarding . . . alternatives, alternative siting and . . . we discussed three alternative sites that I could see. One was in front of the property, the dilemma there (inaudible) clearing in the area of influence and the front setback. Effectively, there is no place to put a house at the front of the property. We look at the center, here, there is [a] . . . pocket where there's not much of an area of influence and . . . the dilemma there was, when speaking with [the applicant's] engineers, that the ground water is . . . virtually on the surface at that location so there is no suitable septic location that could be found in that area . . . we discussed the potential of going further to the rear [but] the problem . . . is that there is some fairly substantial wetlands. . . . So . . . unfortunately we got a big piece of property with a very small area that can be construct[ed] upon." (ROR, Item #4, p. 29.) The commission also considered the Wysockis' alternative that the house be located to the rear of the property, but rejected it since any attempt to access that part of the property would have a greater impact on the wetlands. (ROR, Item #4, pp. 13-14.) The chairman stated, "how's he going to get back there . . . I don't see how that's going to reduce his impact on the wetlands . . . How is he going to get to his house without using this road?" (ROR, Item #4, p. 14.)
Similarly, there is no merit to the plaintiffs' claim that the commission failed to consider the town engineer's recommendation that the house be located outside the regulated area. Indeed, the town engineer's report on Saxon's application was read into the record. (ROR, Item #4, p. 1.) In response, Saxon's attorney stated, "in so far as the house location, when speaking to Mr. Saxon, he said that he would be willing to move the footprint of the building outside of the regulated area." (ROR, Item #4, p. 4.)
Finally, the site plan itself strongly supports an inference that there was no feasible and prudent alternative to Saxon's proposal. The plan reveals a parcel of land which is approximately 900 feet wide by 300 feet deep but which is, essentially, landlocked but for a very narrow strip of land that connects the property to Jobs Hill Road on its westerly CT Page 5654 boundary. (Supp. ROR, Item #1.) Extensive wetlands exist throughout the property and are clearly depicted on the site plan. (Supp. ROR, Item #1.) A close examination of the plan reveals that the house is located in the area closest to Jobs Hill Road that can accommodate a home site. As previously noted, an existing woods road runs along the width of the property from east to west and passes directly in front of the home site. Utilization of this road to access the home site minimizes the impact on the wetlands since any alternative site, assuming one exists, would require the construction of a new driveway through undisturbed wetlands. While such an alternative might be feasible, it could hardly be deemed prudent in light of the environmental goals sought to be achieved.
B. Whether the commission failed to follow town inland wetlands regulations
The plaintiffs also allege several violations of the town's inland wetlands regulations as grounds for sustaining their appeal. The court shall address each claim individually.
First, the plaintiffs claim that the commission improperly ignored § 7.3 of the regulations, which provides that an application shall include, in writing, "[a]lternatives considered by the applicant and why the proposal to alter wetlands set forth in the application was chosen."
The plaintiffs' assertion that Saxon failed to provide, in writing, alternatives which were considered is not supported by the record. Section F of the application states: "Please list all alternatives in detail and explain why the proposal to alter wetlands or water courses set forth in the application was chosen." (ROR, Item #1b.) Saxon answered section F in the space provided as follows: "Configured driveway as to not cross additional wetlands or watercourse, use the existing woods road for remaining driveway access to house site. Position proposed house and septic to minimize the amount of buffer area impact. This area impacts the wetlands buffer the least amount." (ROR, Item #1b.)
The plaintiffs' next claim is that Saxon violated § 7.3[7] of the regulations by failing to locate, on the site plan, all watercourses on the property. Specifically, the plaintiffs allege that the culvert at issue is actually a watercourse since water flows through it. (Plaintiffs' Memorandum, pp. 3-5.) The plaintiffs' cite to § 2.1 (dd) of the regulations, which defines "watercourses" as "rivers, streams, brooks, waterways, lakes, ponds, marshes, swamps, bogs, and all other bodies of water, natural or artificial . . . which are contained within, flow through or border upon the Town or any portion thereof. . . ." Based on the aforementioned definition, the plaintiffs assert that "[w]etlands deal with land while watercourse deals with both contained and flowing bodies of water . . . the outlet pipe is a flowing body of water." CT Page 5655 (Plaintiffs' Memorandum, p. 4.) As further support for their claim that the culvert is a watercourse, the plaintiffs cite the remarks of Saxon's attorney, Fader, describing to the commission the materials to be used to improve the driveway through the regulated area he states: "And while we're at it, look at the same page in the upper left hand corner, I think that there is a detail of what the . . . road material would look like when it's installed in the regulated area. Again, the regulated area being the watercourse, the wetlands and, of course . . . the buffer from the wetlands. Um, the material basically [is] a fabric filter and on top of that would be some stones and against some earth material. When speaking to Mr. Sommers today about the benefit of that particular detail it would allow the wetland and water flow actually underneath the road, so again the . . . applicant has taken care in being sensitive to the wetland issues. (ROR, Item #4, p. 3.) The plaintiffs also points to the remarks of Baker that "[t]here was water when we were on the site. When we were there, there was an (inaudible) in the water just to the north of there. It was, it was running but it wasn't bubbling." (ROR, Item #4, p. 24.)
Saxon replies that the plaintiffs' claim that the culvert is a watercourse is unfounded and illogical. Saxon asserts that, pursuant to regulation, a licensed soil scientist determined that the entire area in issue is a wetland. (Defendant's Memorandum, pp. 10-11.) Saxon further argues that, implicit in the commission's approval of the application, was a factual determination that the regulated area described in the application was indeed a wetland. (Defendant's Memorandum, p. 11.) Finally, Saxon argues that § 2.1 (dd) of the regulations defines "watercourse" as a "body of water" and a manufactured item, such as the subject culvert, is not a body of water. (Defendant's Memorandum, p. 12.)
There is no evidence in the record to support the plaintiffs' claim that Saxon failed to locate a watercourse on the site plan. The regulated areas are clearly marked on the site plan and were determined by a licensed soil scientist. (Supplemental ROR, Item #1.) The statement by Saxon's attorney that the materials used to construct the wetlands portion of the road would permit "the wetlands and water [to] flow actually underneath the road" and the statement by the town planner that "there was water when we were on the site . . . it was running but it wasn't bubbling," are, in the court's opinion, as suggestive of a wetland as they are of a watercourse. Indeed, § 2.1 (ee) of the regulations provides, in relevant part, that "`wetlands' means land, including submerged land as defined in Section 2.1 (aa). . . ." Section 2.1 (aa) provides that "`submerged lands' means those lands which are inundated by water on a seasonal or more frequent basis." Thus, the fact that water was noticed on the subject property is not inconsistent with a wetland. CT Page 5656 Finally, it should be noted that the plaintiffs' interpretation of the word "watercourse" would, in practical terms, confer upon every drainage pipe in the state protected status under the inland wetlands and watercourses act, an absurd result in the court's opinion.
The plaintiffs' next claim is that the existing pipe is actually a dam controlling the water level of a pond on land to the north. (Plaintiffs' Memorandum, p. 5.) Specifically, the plaintiffs assert that "the culvert acts as a dam in the watercourse which is sought to be affected by the Saxon application" and "modifications to a dam is an activity within the exclusive jurisdiction of and regulated by the Commissioner of Environmental Protection." (Plaintiffs' Memorandum, pp. 6-7.) Thus, the plaintiffs argue, "the Commission should have referred this application to the Commissioner of Environmental Protection." (Plaintiffs' Memorandum, p. 7.) Saxon responds that the plaintiffs' argument is "reckless," and that the plaintiffs' have "elevated a pipe to the status of a dam falling under [the] DEP's jurisdiction. . . . The plaintiffs have lost their sense of proportion. The wetland activity in issue is the replacement of an existing culvert with another culvert that is 18" in diameter. To now somehow elevate a relatively small construction implement to the status of a dam requiring DEP's oversight is outlandish." (Defendant's Brief, p. 15.)
The court agrees with Saxon's assessment of the plaintiffs' claim. Indeed, the court finds nothing in the record to support the plaintiffs' assertion that the subject culvert is in fact a dam.
The plaintiffs next claim that Saxon made a false statement on the statewide reporting form in violation of § 8.8 of the regulations.[8]
Specifically, the plaintiffs' claim that Saxon left blank section 7(c), entitled "stream alterations," which requires the applicant to state the number of linear feet of the "river, brook, stream, or other watercourse directly altered as a result of the action taken by the agency." (Plaintiffs' Memorandum, p. 8.) Saxon responds that he completed the reporting form properly and adequately. Specifically, he argues that the "stream alteration" requirement applies to "watercourses" and that he completed the portion of the form pertaining to "wetlands" (Defendant's Memorandum, p. 19.)
As already stated, the court finds no evidence in the record to support the plaintiffs' claim that the culvert in issue is a watercourse. Consequently, the plaintiffs' claim that Saxon failed to report proposed alterations to a watercourse on the reporting form is without merit.
The plaintiffs next claim that Saxon's application was incomplete in violation of sections 7.3(d), 7.3(g), 7.3(f), 3.1 and 14.4 CT Page 5657 respectively.
Section 7.3 provides in relevant part: "All applications shall include the following information in writing . . . (d) the geographical location of the property which is to be affected by the proposed activity, including a description of the land in sufficient detail to allow identification of the inland wetlands and watercourses, area(s) of wetland or watercourse disturbance, soil type(s) and vegetation . . . (g) A site plan showing existing and proposed conditions in relation to wetlands and watercourses. . . ." The plaintiffs claim that Saxon's application was incomplete because the wetlands on the easterly portion of the property were not delineated on the site plan. (Plaintiffs' Memorandum, p. 13.) The plaintiffs argue that had the additional wetlands been marked on the site plan, the commission would have concluded that placing the house to the rear of the parcel was the more feasible and prudent alternative because there are fewer wetlands in the rear. (Plaintiffs' Memorandum, p. 13.) Saxon counters that § 7.3(d) does not require that the wetlands on the entire 22 acre be flagged. Moreover, Saxon argues, pursuant to § 7.2, which provides that "[n]o application shall be deemed complete unless it shall be in such form and contain such information as the Agency deems necessary for a fair and informed determination of the issues," the commission determines the sufficiency of the information contained within an application. (Defendant's Memorandum, p. 25.) "The Commission did not ask the defendant to delineate the wetlands on the entire 22 acres and, by its inaction, deemed the defendant's application to be therefore `complete.'" (Defendant's Memorandum, p. 25.) Finally, Saxon argues that "[t]he plaintiffs' contention that the wetlands on the entire 22 acres should be specifically located makes no sense in light of the defendant's proposal. Even if the wetlands on the rear portion of the defendant's property [were] delineated, the defendant would be unable to place a home in this area because no access exists to get to the rear portion and, in any event, any work conducted in the rear would have a greater and more significant impact [on] the wetlands [than] in the area of the defendant's proposed house location." (Defendant's Memorandum, p. 26.)
Section 7.3(d) simply states that an application shall include a description of the land in sufficient detail to allow identification of the inland wetlands and watercourses "of the property which is to be affected by the proposed activity." (ROR, Item #6, p. 18.) The wetlands on the portion of the property affected by the proposed activity are clearly delineated on Saxon's site plan. (Supp. ROR, Item #1.) The plaintiffs cite no case law to support their claim that the wetlands on the entire parcel should have been flagged. Nor is there any evidence that the commission was unable to make a fair and informed decision on the application without the information. Indeed, the evidence in the CT Page 5658 record strongly supports the commission's conclusion that running a driveway to the rear of the parcel would have a far greater impact on the wetlands than Saxon's proposal because it would require construction of an even longer driveway through previously undisturbed wetlands.
The plaintiffs also claim that Saxon's application was incomplete and in violation of § 14.4 of the regulations because the site plan was not signed by John Ianni, the soil scientist who flagged the wetlands on the property. The plaintiffs argue, "[t]he commission's failure to require the Applicant to obtain the Soil Scientist's signature is a fatal error. An Inland Wetland Agency must follow the regulations which it has adopted. . . ." (Plaintiffs' Memorandum, p. 20.)
Section 14 of the regulations governs the procedure for amending the town's inland wetlands and watercourses map and regulations. (ROR, Item #6, p. 38.) Section 14.4 pertains solely to petitions requesting changes or amendments to the town map and, therefore, is not applicable to Saxon's application for a permit to conduct a regulated activity. (ROR, Item #6, pp. 38-39.) The plaintiffs' claim that the commission failed to follow § 14.4 is, consequently, without merit.
The plaintiffs next claim that Saxon did not comply with section G of the application, which requires the scale of the site plan to be 1" = 40' and the scale of the location map to be 1" = 1000'. (Plaintiffs' Memorandum, p. 23.) Saxon's site plan is drawn to the 1" = 40' scale, but the location map is drawn to a 1" = 2000' scale.
An application for an inland wetlands permit must be in substantial compliance with the applicable regulations. See, e.g., Michel v. Planning Zoning Commission, 28 Conn. App. 314, 324, 612 A.2d 778 (1992), cert. denied, 223 Conn. 923, 614 A.2d 824 (1992); T. Tondro, Connecticut Land Use Regulations (2d Ed. 1992) Ch. 7, pp. 431-433. "Substantial compliance with a statute or regulation is such compliance with the essential requirements of the statute or regulation as is sufficient to assure its objectives. What constitutes a substantial compliance is a matter depending on the facts of each particular case." DeAngelis v. WaterburyInlands Wetlands Watercourses Commission, Superior Court, judicial district of Waterbury, Docket No. 132755 (May 16, 1997, Pellegrino, J.). See also Sorrow v Zacchera, Superior Court, judicial district of Hartford, Docket No. 580072 (December 23, 1998, Teller, J.). Moreover, "[W]hen reviewing the actions of the Commission to determine if its findings complied with the standards set out in the regulations, we are not compelled to indulge in a microscopic search for technical infirmities . . . The determination of what the public interest requires is in the discretion of the Commission." McCrann v. Planning ZoningCommission, 161 Conn. 65, 71, 282 A.2d 900 (1971). "This cautionary CT Page 5659 advice is especially apt whenever the Court is reviewing a decision of a local commission composed of lay persons." Gagnon v. Inland Wetlands Water Courses Commission, 213 Conn. 604, 611, 569 A.2d 1094 (1990).
In the court's view, by exceeding the requirements of section G, Saxon's location map is in full, not just substantial, compliance with those requirements. The purpose of the location map is to place the subject property in the larger context of the greater vicinity and/or town. The scale of Saxon's map serves that purpose fully.
Finally, the plaintiffs claim a violation of § 11.5 of the regulations, which provides in pertinent part that "[i]f an activity authorized by the inland wetland permit also involves an activity or project which requires zoning or subdivision approval . . . a copy of the decision and report on the application shall be filed with the Town of Ellington Planning and Zoning Commission within fifteen days of the date of the decision." (Plaintiffs' Brief, p. 21.)
The issue before the court is whether substantial evidence exists in the record to support the commission's decision. Whether the commission subsequently filed a copy of that decision with the town zoning commission is irrelevant to the court's decision.
 VI CONCLUSION
For the foregoing reasons, the plaintiffs' appeal is dismissed.
Klaczak, J.